658 So.2d 728 (1995)
STATE of Louisiana, Plaintiff-Appellee,
v.
Howard Gregory CANNON, Defendant-Appellant.
No. 26906-KA.
Court of Appeal of Louisiana, Second Circuit.
June 21, 1995.
*729 John William Focke, II, Monroe, for appellant.
Richard Ieyoub, Atty. Gen., Jerry L. Jones, Dist. Atty., J. Michael Ruddick, Asst. Dist. Atty., for appellee.
Before MARVIN, SEXTON and LINDSAY, JJ.
MARVIN, Chief Judge.
After being convicted of second degree murder of Roger Larson by a unanimous jury and sentenced to the mandatory life-without-benefit, Howard Greg Cannon appeals. Finding the evidence legally sufficient to convict and seeing no merit in the other arguments, we affirm.

FACTS
The murder stems from a volatile romantic relationship between Cannon and Ann Larson, the victim's sister. This relationship, which began in 1988, produced a son. By the late summer of 1992 the two stopped seeing each other.
On September 24, 1992, Cannon and two friends, Kathryn Perry and Frederick Carter, after drinking at a Monroe bar, drove to Carter's home. All three were intoxicated. About 3:30 a.m., Carter became irritated because Cannon and Perry would not leave. With his father's Winchester .308 caliber lever-action rifle (a powerful weapon, suitable for hunting deer), Carter threatened to shoot Cannon and Perry unless they left.[1] Cannon and Perry then drove to Perry's motel room.
Cannon and Perry spent most of the next day at the motel, drinking heavily. Between 6:30 and 7:00 p.m., Cannon told Perry that he was going to purchase more liquor. Perry let Cannon use her car. Instead of going to the liquor store, Cannon drove to Carter's house. Although Carter was not there, Cannon *730 entered the home and telephoned Ann Larson.
While speaking with Ann Larson, Cannon overheard a man coughing in the background. Cannon became agitated because another man was in her house. This other man was a neighbor, Larry McAdams, who was there to repair a ceiling fan and to visit with Ann Larson and her brother, Roger. After Cannon insisted on speaking to McAdams, Cannon concluded his conversation with Ann Larson by saying, "All right. I told you. I told you," before hanging up. Because Cannon seemed angry, Ms. Larson telephoned the police, but did not request immediate assistance. During the previous month, Cannon had threatened to kill Ann Larson.
Cannon took the Winchester rifle from Carter's house to the car. Some time later, he drove to Ann Larson's house, arriving there about 45 minutes after the phone call. Looking through a window, he saw Ann Larson and McAdams embracing.
When McAdams left the Larson home through the front door shortly after Cannon arrived, Cannon pointed the rifle at him, forcing him to kneel on the ground. Cannon then said "No, you're not ... I'm not going to shoot you now. You're my way in the house." Cannon placed the muzzle of the rifle to McAdams's back and made him knock on Ann Larson's front door. Ann Larson was on the phone talking to her mother. At McAdams's knock, Ann Larson put the phone down without breaking the connection and went to the door. When she opened the door, Cannon pushed McAdams inside the living room, following him inside.
The push caused McAdams to fall to the floor. Cannon then hit Ann Larson with the rifle, kicking her, knocking her down. She screamed, jumped to her feet and ran across the room toward the kitchen. Ann Larson's mother, still connected by telephone, hearing her daughter scream, called the police. Ann Larson ran by her brother Roger in the kitchen, where Roger had picked up the telephone. When Cannon chased Ann Larson toward the kitchen, he broke the light fixture on the ceiling fan with the barrel of the rifle. Cannon stopped in the living room somewhere outside the kitchen doorway and raised the rifle to his shoulder. As Ann Larson entered the kitchen and turned the corner, she heard her brother say "Greg, you better...." She stopped running and heard, but did not see, Cannon fire the rifle.
Ann Larson then heard Cannon walking farther back into the living room and hastily ran from the kitchen toward the living room. When leaving the kitchen, she saw her brother standing by a chair. Running past her brother into the living room, she saw that he had been shot.
In the living room she pleaded with Cannon not to shoot her. Cannon's young son then came into the living room. Cannon then unloaded the rifle and asked Ann Larson for a cigarette. Ann Larson testified that Cannon said, "I didn't know [the gun] was loaded." Ann Larson's mother soon arrived, closely followed by the police. A sample taken at 9:29 p.m. showed that Cannon's blood alcohol level was 0.12 grams/percent.
Cannon's version of events has many unexplained gaps. He attributed his poor memory to blackouts caused by his intoxication, but he explained that he did not intend to kill or to cause great bodily harm to Ann Larson, her brother, or anyone else. He said that the rifle was probably fired during a struggle with Ann Larson.

PROCEDURAL HISTORY
On June 17, 1993, trial in this matter was set for July 12. The State answered Cannon's discovery motion on June 22. The State conducted gunshot residue tests of both Cannon and Ann Larson. The results of those tests were sent to the State Wednesday, July 7, and to Cannon Thursday, July 8. The tests showed that Ann Larson had residue on her hands consistent with the chemical products of the discharge of a weapon. On Friday, July 9, defense counsel filed a motion for continuance to study the evidence further and to obtain an expert of his own. The trial court denied the continuance on Monday, July 12. Counsel then sought a writ from this court, which was denied. Trial began July 12.

*731 DISCUSSION

Denial of Continuance
Cannon complains that the trial court should have granted him a continuance to obtain an expert witness on gunshot residue. The decision to grant a continuance is governed by CCrP Art. 712:
A motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefor.
This statutory rule has given rise to jurisprudence holding that the decision to grant or to deny a continuance lies within the wide discretion of the trial court. State v. Martin, 93-0285 (La. 10/17/94), 645 So.2d 190. See also State v. Knighton, 436 So.2d 1141 (La. 1983), U.S. cert. denied. As stated by this court:
LSA-C.Cr.P. Art. 712 commits a motion for continuance to the sound discretion of the trial judge, and his ruling will not be disturbed on appeal absent a showing of abuse and specific prejudice. State v. Gaskin, 412 So.2d 1007 (La.1982); State v. Ashley, 569 So.2d 276 (La.App. 2d Cir. 1990), writ denied, 575 So.2d 387 (La.1991). This specific prejudice requirement will only be disregarded where the time allowed defense counsel to prepare is so minimal that the "fairness" of the proceeding is questionable. State v. Jones, 395 So.2d 751 (La.1981); State v. Ashley, supra. The reasonableness of discretion issue turns primarily upon the circumstances of the particular case. State v. Simpson, 403 So.2d 1214 (La.1981); State v. Ashley, supra. (Knighton citation omitted)

State v. Smith, 25,841 (La.App. 2d Cir. 2/23/94), 632 So.2d 887, 890.
The importance of the "circumstances of the particular case" is demonstrated by such cases as State v. Free, 26,267 (La.App. 2d Cir. 9/21/94), 643 So.2d 767 and State v. Benson, 368 So.2d 716 (La.1979). In Free, this court held the denial of a motion for continuance was proper in circumstances where the defendant received Prieur notice on the Thursday before his trial began on Monday because he was aware of the substance of the Prieur evidence before receiving the notice and therefore suffered no prejudice from such a short notice.
In Benson, an armed robbery conviction was reversed, partially because of the trial court's failure to grant the defendant a continuance. The robber wrote and presented a note demanding money to a bank teller. Defense counsel first learned of the existence of the note on Wednesday and on Friday filed a motion for a continuance to obtain a handwriting expert. The motion was considered and denied on Monday, the day the trial began. The defendant was convicted. The supreme court decided that the denial of the continuance was an abuse of discretion because of the short time counsel had to prepare to counter the state's handwriting expert. The court noted that the two- or three-day period between discovery of the evidence and trial might have been insufficient for a defense expert to adequately examine the evidence.
In the present case, Cannon argues that on July 8, when he learned of the results of the gunshot residue (GSR) tests, he did not know that Ann Larson had admitted touching the weapon. The fact that particles consistent with GSR were found on Ann Larson, he contends, bolstered the defense theory that the weapon "went off" during a struggle between Ann Larson and Cannon. However, the State's June 22 answer to Cannon's motion for discovery included the fact that a GSR kit for Ann Larson was being analyzed, so Cannon had actual notice he might need a gunshot residue expert.
At trial, the State's expert, Joe Andrews, Jr., testified that particles "characteristic of GSR" were discovered on Ann Larson's hands. Lead, but nothing identifiable as GSR, was found on Cannon's hands. The rifle used by Cannon deposits little GSR on the firing hand. As noted by this court in the writ denial, one of Cannon's principal complaints in his motion for a continuance that the State's expert could draw more definite conclusions if he knew the type of ammunition used in the killingwas negated when that information was provided and the requisite tests conducted. Andrews testified that the presence of GSR-characteristic particles *732 on a person leads to the conclusion that the person either has recently fired a weapon, handled a recently fired weapon or been in the immediate environment where a weapon was recently fired.
Andrews noted that the particles recovered from Ann Larson could not be definitely identified as GSR because they lacked one of the essential elements, barium, required to make that finding. However, even though the ammunition in this case contained barium, Andrews said that it is not unusual to find that element missing in GSR particles produced by such ammunition.
Testifying about the way in which GSR particles are emitted from a firearm as it discharges, the expert stated that particles may be present on the firearm itself, on the shooter, or up to 15 feet in front of the muzzle, and that there is a great deal of residue discharged from the muzzle of this rifle when it is fired. He also said that the GSR particles, once deposited on a surface, may be transferred to another surface that comes into contact with the particles. Andrews specifically explained that GSR particles could transfer from the body of a victim shot at close range onto the hands of a person who touched the victim. If, as Ann Larson testified, she touched her brother shortly after he had been shot, it is possible for Ann Larson to have GSR particles on her hands, according to Andrews.
Andrews was subjected to intense cross-examination. A number of the above points benefitted the defense. The expert stated that the GSR evidence could be consistent with touching a rifle when, or just after, it fires. This statement tends to support Cannon's theory that the weapon went off during a struggle. We think it likely that another expert would have agreed that the GSR particles either transferred from the body of the victim or from the rifle to Ann Larson. Because the opinion evidence favorable to Cannon and the state was presented, Cannon has not sufficiently shown prejudice by the denial of the continuance that would warrant our finding reversible error.
We acknowledge that a showing of prejudice is not always required. Benson, supra; State v. Winston, 327 So.2d 380 (La. 1976) (three days after appointment for counsel to prepare for trial). Benson found the denial of a continuance warranted reversal of the conviction. We note that, unlike the record before us, the Benson record, however, established that Benson's counsel did not know of the existence of the note and the handwriting exemplar until five days before trial. The court also found meritorious one other of Benson's assignments of error.
Courts have generally been reluctant even after Benson to disturb an otherwise valid conviction because of the denial of a continuance where the specific prejudice is not shown. The rare reversals typically result from the appointment of counsel immediately before trial which effectively denies the defendant the right to counsel. See State v. Knight, 611 So.2d 1381 (La.1993); State v. Simpson, 403 So.2d 1214 (La.1981). That is not the case here, where defense counsel knew of the GSR kit for Ann Larson was being analyzed when he received the State's answer to discovery on June 22. The results of the GSR tests were promptly furnished by the State to the defense within 24 hours after the State received the results. Moreover, Ann Larson denied Cannon's testimony about a struggle with the rifle.
This assignment presents no reversible error.

Sufficiency of the Evidence
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Williams, 25,835 (La.App. 2d Cir. 2/23/94), 632 So.2d 893; State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied. This court's authority to review questions of fact in a criminal case is limited to the Jackson sufficiency of evidence evaluation and does not extend to credibility determinations made by the trier of fact. LSA-La. Const. Art. 5, Sec. 5(C); State v. Lee, 25,917 (La.App. 2d Cir. 5/4/94), 637 So.2d 656, writ denied; State v. Ferrell, 25,851 *733 (La.App. 2d Cir. 3/30/94), 634 So.2d 977. We review the record in the light that most favorably supports the verdict.
Second degree murder as defined in LRS 14:30.1 and read to the jury is:
A.... the killing of a human being:
(1) When the offender has a specific intent to kill or inflict great bodily harm.
The trial court included the following instruction in the jury charge:
When a person shoots at another person with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon a third person, if the killing or inflicting of great bodily harm would have been unlawful against the first person, then it would be unlawful against the third person even though it be accidental.
In other words, if the State has proven beyond a reasonable doubt that the defendant had the specific intent to kill one person or inflict great bodily harm upon that person but he accidentally killed or inflicted great bodily harm upon another person, you must transfer that intent from the intended victim to the actual victim.
In brief, Cannon argues that, "[a]t best, the evidence shows that the defendant fired a gun at Ms. Larson after she had turned and run down a hallway" and that the shot may simply have been meant to scare her.
From the testimony of the parties and the photographs of the Larson home, it is difficult to determine the exact location of either of the Larsons or Cannon when Cannon fired the shot that killed Roger Larson. At trial, the witnesses referred to drawings to indicate the relevant positions to the jury. These drawings are not part of the record. Nevertheless, the jury could reasonably have rejected Cannon's contention that the shot was unaimed or unintentional or occurred during a struggle.
The photos of the Larson home depict very small living areas cluttered with furniture and sundry personal items. The clutter leaves very little open space. One photo shows the area of the living room which leads into the kitchen. The uncluttered part of the living room closest to the kitchen is narrow. This open area is bounded on one side by a chair and a cardboard box containing coat hangers and on the other by a chair covered by clothing. One picture demonstrates that Cannon could have seen at least partially into the kitchen from nearly any point in the limited area in which he could have been standing when he fired. The closer Cannon was to the doorway, the farther into the kitchen he could have seen. From this evidence, the jury could have decided that it was possible for Cannon to see Ms. Larson as she turned into the kitchen and perhaps briefly afterwards as well. Ms. Larson testified that the shot was fired just after she ran into the kitchen past her brother and turned right.
From the evidence, the jury was entitled to determine whether the parties' positions indicated that the shot was intended to kill or to cause great bodily harm. Whether the requisite specific intent is present is a factual determination for the trier of fact. State v. Butler, 618 So.2d 572 (La.App. 2d Cir.1993), writ denied.
The facts established by direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant actively desired criminal consequences to result from his conduct. See State v. McCray, 621 So.2d 94 (La.App. 2d Cir.1993); LRS 14:10.
Viewed in the light that most favorably supports the verdict, the evidence allows the conclusion that Cannon, while intoxicated, was attempting to shoot Ann Larson, but simply missed and shot Roger instead.
We find no merit in the sufficiency assignment.

Erroneous Jury Charge
Cannon complains that the trial court erroneously defined specific intent in its charge to the jury. His objection was made in response to the trial court's query to the attorneys about the charge just after it was read. The objection was timely and sufficient under CCrP 801 to preserve the issue *734 for review because it was made in response to the judge's request.
The written charge incorporates verbatim the text of LRS 14:10. However, Cannon complained after the reading of the charge that the trial court omitted part of the definition of specific intent found in LRS 14:10. Here is the colloquy of the objection:
Court: [A]re there any objections to the charge?
Defendant: Your Honor, the only ... I guess I'll make an objection. I believe when the court was defining ... specific intent, the Court did not read the statute correctly. I did not hear the Court say if the circumstances indicate that the defender [sic] ...
Court: I ... The ... that could well be correct, because what I did ... what I did several years ago, I went through that ... those statutes that talk ... describes specific intent and also ... and I changed some wording in there because those words are put in there by law professors who wrote those things, and they're understood by law students and not by an average laymen [sic].
Defendant: Just note my objection.
The transcript of the charge actually read to the jury shows the court read the definition of specific intent as it appears in the written charge. The written charge and the transcript read:
You will notice in the definition of second degree murder that the law uses the term "specific intent." Louisiana Revised Statutes 14:10 defines criminal intent as follows:
"Criminal intent may be specific or general:
(1) Specific intent is that state of mind which exists when circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."
Apparently, in this case, the court did not follow its stated practice of omitting or changing part of the definition of intent. Because the charge was accurate, this assignment of error is without merit.

ERROR PATENT REVIEW
The trial court failed to give Cannon notice of the time limitation for filing applications for post-conviction relief set out in CCrP Art. 930.8. This has no bearing on the sentence and is not grounds to reverse the sentence or remand the case for resentencing. State v. Mock, 602 So.2d 776 (La.App. 2d Cir.1992); State v. Cox, 604 So.2d 189 (La.App. 2d Cir.1992). The district court is directed to send written notice of the prescriptive period for post-conviction relief to Cannon within 10 days of the rendition of this opinion and to file proof of Cannon's receipt of such notice in the record of the proceedings. Mock, supra; State v. Smith, 600 So.2d 745 (La.App. 2d Cir.1992).

DECREE
The conviction and sentence are
AFFIRMED.
NOTES
[1] Perry related that Carter fired the weapon into the air, while Carter denies this. Cannon did not recall. It seems likely that the weapon was fired at this time. Two cartridge cases were found in the victim's home, but the witnesses' testimony reflects that Cannon fired only one shot there. If Carter fired the weapon on the previous night, the fired cartridge case might have remained in the rifle until it was ejected when Cannon cocked the weapon and chambered a loaded cartridge. This rifle, a lever action, ejects spent cases only when the lever is operated to cock and reload the weapon. Therefore, the location of the spent cases does not necessarily reflect the location of the shooter when the shot was fired.