Judgment rendered April 22, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,360-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

BRANDON S. BUTLER                           Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court No. 205,973

Honorable Michael Nerren, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By:  Douglas Lee Harville

J. SCHUYLER MARVIN                   Counsel for Appellee
District Attorney

ANDREW JACOBS
JOHN MICHAEL LAWRENCE
DOUG STINSON
Assistant District Attorneys

* * * * *

Before MOORE, GARRETT, and THOMPSON, JJ.

**GARRETT, J.**

Following a bench trial, the defendant, Brandon S. Butler, was convicted as charged of two counts of first degree murder. He received consecutive sentences of life imprisonment without benefit of parole, probation, or suspension of sentence. The defendant appealed. We affirm the defendant's convictions and sentences.

**FACTS**

In May 2014, Jacqueline Beadle and Karyl Cox were roommates who shared a one-story, three-bedroom house in the 3000 block of Bragg Street in Bossier City. Ms. Beadle, who had a young son, had lived there for about a year; for seven to eight months of that time, her boyfriend, Shawn Washington, lived with her until they broke up in early 2014. Ms. Cox had resided in the Bragg Street house for approximately a month; she had a young daughter, whose custody she shared with the child's father.

On Friday, May 9, 2014, Ms. Beadle dropped her son off at the home of her mother, Joanna Hanson, where he spent the night. On Saturday, May 10, 2014, Ms. Hanson tried repeatedly and unsuccessfully to contact Ms. Beadle by phone and text message. According to Ms. Hanson, it was highly unusual for Ms. Beadle not to call to check on her son and talk to him when he spent the night with his grandmother. Ms. Hanson called several of her daughter's friends, including Mr. Washington, to see if they had heard from her. On Sunday, May 11, 2014, which was Mother's Day, Ms. Hanson went to the Bragg Street house at about 6:30 a. m. because she was worried about her daughter. When she arrived, she noticed that her daughter's car was there, but Ms. Cox's blue, four-door Chevy Cruze sedan was not. She entered the locked residence with a key and found the dog confined in its

crate in the kitchen and "going crazy." After letting the dog go outside, Ms. Hanson went into her daughter's bedroom, where she discovered Ms. Beadle's body on the floor under a comforter. She had been stabbed several times and shot in the forehead. Ms. Hanson then went into Ms. Cox's bedroom, where she discovered her body in bed under the covers. She too had been shot in the forehead; she also had several other gunshot wounds.[1] Ms. Hanson went outside and called 911.

Law enforcement officers arrived and cordoned off the house with crime scene tape. At some point that day, the defendant approached an officer outside the house and asked to speak to a detective. Detective Jeffery Humphrey of the Bossier City Police Department ("BCPD") talked to the defendant, who said that Ms. Cox was his best friend. Thereafter, Detective Humphrey took the defendant to the police station for an interview in which he answered general questions about the victims.

By the following day, Monday, May 12, examination of the crime scene had disclosed the defendant's fingerprint on the door of Ms. Beadle's bedroom in a red substance that appeared to be blood.[2] The defendant was asked to give a second interview. During the first part of this interview, the defendant spoke to Detective Michael Hardesty for about 33 minutes. He described Ms. Cox as his best friend, stated that they spoke almost daily, and said that he was at her house about four days a week. However, he informed

---

[1] The record indicates that Ms. Cox's child was with her father at the time of the murders.

[2] Jeffery Ross, a BCPD crime scene detective, testified that he observed fingerprints in a substance that appeared to be blood on Ms. Beadle's bedroom door. However, he did not believe a test was done to determine if it was actually blood. Michelle Vrana, the DNA section supervisor at the North Louisiana Criminalistics Laboratory ("NLCL"), testified that a sample of suspected blood from the door was visually negative for blood. However, forensic testing of the sample obtained a partial DNA profile that was consistent with Ms. Beadle.

2

the detective that he had not been at the Bragg Street house or in Ms. Cox's car since Tuesday, May 6. He claimed that he had been with Sekeona Campbell, a former girlfriend who was visiting family in Shreveport, from about 11 p.m. Friday night until 7:30 or 8:00 Saturday morning. He stated that, because he did not have a car, his friend, Terrell Stewart, had given him a ride to where Sekeona was staying. This portion of the interview ended shortly after Detective Hardesty confronted the defendant about the bloody fingerprint. The defendant vehemently denied being in the house on Friday night and maintained that his fingerprint could not be on the door in blood.

When the interview resumed after a brief break, Detective Humphrey took over questioning the defendant, who admitted being in the house Friday night. He stated that, after Ms. Cox retired to her bedroom for the night, he was with Ms. Beadle in her bedroom when her former boyfriend, Shawn Washington, appeared at her partially open window. He said Ms. Beadle jumped up, tripped on a cover, fell, and busted her nose on a dresser or nightstand. The defendant said he helped her get up, and she told him to leave, which he did. According to the defendant, Mr. Washington, who had come through the window, was threatening to "fuck up" Ms. Beadle and kill her. The defendant said he walked to the Orchard Apartments where he was living, took a shower, and called Mr. Stewart for a ride. He revised his arrival time at the place where Sekeona Campbell was staying to 1:30 or 2:00 a.m. Saturday morning. However, according to Sekeona, the defendant did not arrive until about 4 a.m. Saturday morning and he was driving a dark, four-door car which he said belonged to a female friend. She observed a picture of a child in the area of the car's speedometer.

After the victims' bodies were found on Sunday morning, the police utilized the GPS technology in Ms. Cox's missing car to locate it in the driveway of a vacant house in the 4000 block of Sheryl Street, which was not far from the Orchard Apartments. There appeared to be blood on the door and the driver's seat. Forensic examination determined that the defendant's fingerprint was on the driver's door handle and the blood on the driver's seat belonged to Ms. Beadle. Photos of the recovered car show pictures of Ms. Cox's young daughter prominently displayed on either side of the speedometer.

During his second statement on Monday, the defendant told the police that he had given his mother the clothes he was wearing Friday night to be laundered. Later that day, the police retrieved them from the trunk of her car and submitted them for testing. Ms. Beadle's blood and DNA were found on the defendant's underwear.

In July 2014, the defendant was indicted on two counts of first degree murder, and the state gave notice of its intent to seek the death penalty. The matter was set and reset for trial numerous times. In August 2018, the matter was set for a four-week jury trial on March 11, 2019. The state eventually withdrew the request for the death penalty in January 2019, at which time the defense waived a jury trial in favor of a bench trial. The trial date of March 11, 2019, was maintained.

Trial began March 11, 2019, and concluded on March 18, 2019. On March 20, 2019, the trial court announced its verdicts in court, finding the defendant guilty as charged on both counts of first degree murder, and giving oral reasons for its decision. It also issued a written opinion in which it extensively discussed the evidence presented at trial and detailed its

4

reasons for finding the defendant guilty. In May 2019, the trial court imposed the mandatory sentence of life imprisonment without benefit of parole, probation, or suspension of sentence on each count. It ordered that the sentences be served consecutively.

The defendant appealed, asserting two assignments of error: (1) the evidence was insufficient to prove his guilt beyond a reasonable doubt; and (2) the trial court erred in denying the defendant's motions for continuance.

## SUFFICIENCY OF EVIDENCE

The defendant contends that the trial court erred in finding that the state presented sufficient evidence to support his convictions for the first degree murders of Ms. Beadle and Ms. Cox. He argues that the state's evidence was insufficient because it did not exclude a reasonable hypothesis of innocence, i.e., that Mr. Washington murdered the victims. Among the facts he claimed that the trial court overlooked were the failure to take fingernail scrapings from the victims, Mr. Washington's palm print on Ms. Beadle's door frame, and matted grass under Ms. Beadle's window.

### *Law*

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 2001-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Williams*, 52,519 (La. App. 2 Cir. 2/27/19), 266 So. 3d 485, *writ denied*, 19-00718 (La. 10/21/19), 280 So. 3d 1172; *State v. Brooks*, 49,024 (La. App. 2 Cir. 5/14/14), 139 So.

5

3d 1072, *writ denied*, 14-1202 (La. 2/13/15), 159 So. 3d 459. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Brooks*, *supra*.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Lambert*, 52,004 (La. App. 2 Cir. 5/23/18), 248 So. 3d 621; *State v. Robinson*, 50,643 (La. App. 2 Cir. 6/22/16), 197 So. 3d 717, *writ denied*, 16-1479 (La. 5/19/17), 221 So. 3d 78.

Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Broome*, 49,004 (La. App. 2 Cir. 4/9/14), 136 So. 3d 979, *writ denied*, 14-0990 (La. 1/16/15), 157 So. 3d 1127. For a case resting essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Mingo*, 51,647 (La. App. 2 Cir. 9/27/17), 244 So. 3d 629, *writ denied*, 17-1894 (La. 6/1/18), 243 So. 3d 1064.

6

The appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Brooks*, *supra*. A reviewing court accords great deference to a trier of fact's decision to accept or reject the testimony of a witness in whole or in part. *State v. Lambert*, *supra*; *State v. Sims*, 49,682 (La. App. 2 Cir. 2/27/15), 162 So. 3d 595, *writ denied*, 15-0602 (La. 2/5/16), 186 So. 3d 1161. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Lambert*, *supra*.

La. R.S. 14:30 defines first degree murder, in relevant part, as follows:

A. First degree murder is the killing of a human being:
. . .

(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.

Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); *State v. Walker*, 51,217 (La. App. 2 Cir. 5/17/17), 221 So. 3d 951, *writ denied*, 17-1101 (La. 6/1/18), 243 So. 3d 1064. As a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances of the offense and the defendant's actions. *State v. Christopher*, 50,943 (La. App. 2 Cir. 11/16/16), 209 So. 3d 255, *writ denied*, 16-2187 (La. 9/6/17), 224 So. 3d 985. The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. *State v. Mingo*, *supra*. The determination of whether the requisite intent is present is a question for the trier of fact. *State v. Walker*, *supra*.

7

*Testimony*

The defendant's trial took place over six days and involved the testimony of 25 live witnesses and the admission of a voluminous number of exhibits. Other evidence was received in the form of reports by expert witnesses. In addition to the facts already mentioned, the evidence presented established the following.

Detective Hardesty was the lead detective investigating the homicides. After arriving at the crime scene on Sunday morning, he spoke with Ms. Hanson, who informed him that Ms. Cox's car was missing. He obtained the GPS information that led to the discovery of the car on nearby Sheryl Street. He went to that location and remained there until crime scene personnel arrived to take charge of the vehicle.[3] While there, he observed that a deep ditch and a trail ran from the dead-end of Sheryl Street to the Orchard Apartments. Upon returning to the crime scene on Bragg Street, he went through the house. He noticed that the residence was warm, with a temperature of 84.7 degrees. He also observed that the door to Ms. Cox's bedroom had been forced open. There was an empty safe sitting open on the floor of Ms. Cox's bedroom. In Ms. Beadle's room, the mattress was bare. A purse was found on the bed, as were its strewn contents.

Members of the BCPD crime scene unit processed the crime scene on Bragg Street and Ms. Cox's car. In addition to taking photographs, they collected numerous pieces of evidence, including shell casings, fingerprints, and the victims' cell phones. They also swabbed various locations for DNA.

---

[3] The exterior of the car was photographed at the Sheryl Street location. The vehicle was then towed to a crime scene facility for processing. As previously noted, the defendant's fingerprint was found on the driver's door handle and Ms. Beadle's blood was detected on the driver's seat.

Detective Humphrey was also present at the crime scene. He was told that someone outside wanted to talk to a detective. He spoke to the defendant, who informed him that his friends were in the house and asked if they were dead. Detective Humphrey took the defendant back to the BCPD station to ask him general questions about the victims. The defendant told him that Ms. Cox was his best friend and mentioned that she kept weed and money in a safe.

As part of their investigation, both Detectives Hardesty and Humphrey participated in a canvass of the neighborhood. Detective Hardesty spoke to Jennifer Pearson, who lived next door to the victims. She told him that she had not seen or heard anything unusual. The detectives also spoke to other individuals who were close to the victims, including former boyfriends, such as Mr. Washington.

Mr. Washington testified that he and Ms. Beadle broke up in early 2014, but he could not specifically recall when. He stated that he never had a key to Ms. Beadle's house and, when he lived there, he would either call or knock to gain entry. He further stated that he had not been in her house since their breakup. He admitted talking to Ms. Beadle around May 8 or May 9, when she called to tell him she had gotten him a present for his birthday on May 12, if he wanted to come get it. He testified that he never went to pick it up. Ms. Beadle's mother called him on Saturday or Sunday looking for her daughter; he told her that he had not seen Ms. Beadle. He denied killing Ms. Beadle and Ms. Cox.

At the time of the murders, Mr. Washington was living with his new girlfriend, Nancy Campbell. By the time of trial, they were no longer together. Nancy Campbell testified that Mr. Washington would drop her off

and pick her up from work. As a CNA supervisor, she worked 12-hour shifts from 6:45 a.m. to 7:15 p.m. She said they would converse throughout the day. She did not recall anything out of the ordinary happening on Saturday. She testified that he took her to work on Sunday. She recalled him telling her that he knew someone who was killed and that he seemed sad. However, she could not recall when he told her. She said it could have been when he was taking her to work, but it also could have been later.

On Monday, May 12, 2014, Detective Hardesty attended the victims' autopsies. Ms. Beadle's autopsy was conducted by Dr. James Traylor, Jr. She had a fatal gunshot wound over her left eyebrow, which Dr. Traylor characterized as a tight contact wound. Ms. Beadle had stab wounds to the left side of her neck and her left shoulder. She also had incised wounds to both hands which Dr. Traylor characterized as defensive wounds. Additionally, she had suffered a blunt force injury to the left bridge of her nose, as well as abrasions to various parts of her body, including her right cheek, left collar bone, left arm, and left lower back. Dr. Lon Jin performed Ms. Cox's autopsy. She had sustained four gunshot wounds, including a fatal contact wound to the forehead. She also had a near contact wound to the left cheek, as well as gunshot wounds to both forearms or wrists which were of intermediate range. One of the forearm gunshots had reentered her right upper arm. Both forensic pathologists testified that no fingernail scrapings were taken from the victims because the victims' hands were not bagged when the bodies arrived for autopsy.[4] Dr. Traylor also noted that

---

[4] However, during the testimony of Detective Matthew Childs, he was shown photos he took at the crime scene depicting bags from the coroner's office on the hands of both victims.

10

they were not requested by law enforcement. Dr. Jin testified that the warm temperature in the Bragg Street house negatively affected his ability to determine the time of death. Carla White, a NLCL firearms examiner, testified that the bullets recovered during the victims' autopsies had similar class characteristics, and that the four fired cartridge cases found in both victims' bedrooms and the one found in Ms. Cox's hair during her autopsy were all fired from the same gun. According to Detective Hardesty's testimony, neither the gun nor the knife used in the murders was ever recovered.

Also on Monday, the detectives learned that the crime scene unit had found the defendant's fingerprint in a red substance on Ms. Beadle's bedroom door. As discussed *supra*, they interviewed the defendant a second time. After he initially denied being at the Bragg Street house on Friday night, the defendant admitted being there but claimed that Mr. Washington was also present and angrily making death threats against Ms. Beadle. While at the BCPD station, the defendant voluntarily gave the police his cell phone for examination.

On Wednesday, May 14, 2014, after learning that the police wanted to speak to him, Mr. Stewart voluntarily went to the BCPD station to give a statement. Mr. Stewart testified that he drove the defendant to Bragg Street on Sunday after hearing about the murders and that he was aware of the defendant talking to the police. He further testified that, after speaking to the police, the defendant asked Mr. Stewart to tell the authorities that he had picked up the defendant "from the females' house" on Friday night. However, Mr. Stewart testified that he did not pick up the defendant or even see him on Friday night. He also testified that, when he was with the

11

defendant on Sunday, the defendant never mentioned Mr. Washington. Likewise, Latommorris Clark, the defendant's best friend, testified that, when he spent time with the defendant on Saturday afternoon and on Sunday, he never mentioned Mr. Washington to him. Mr. Clark also stated that, at the time of the murders, the defendant was "going through a lot," namely women problems, financial situations, trying to take care of his children, and trying to "get [himself] together."

Also on Wednesday, May 14, the police took a statement from Sekeona Campbell in which she told them about the defendant's visit. At trial, she testified that the defendant came to see her at about 4 a.m. Saturday morning in a dark, four-door car, which he said belonged to a female friend. A photo of a child was in the area of the speedometer. Although she had told the police the car was black, at trial she admitted that, due to "the hour of the night" when she saw it, she could not be certain of its color. She testified that the defendant stayed about three hours, during which time they were intimate. Sekeona Campbell allowed the police to take photos of the texts she exchanged with the defendant. Shortly after he left, he texted her as follows: "[M]y mind was somewhere else but I promise to make it up to u." She texted him to find out what he meant. He later texted back: "Shit got real for the first time last night."

On Friday, May 16, 2014, the police got consent to search a house on Camellia Lane in Bossier City where Christopher Wilson, a friend of the defendant's, lived with his mother. This house was located between the place where Ms. Cox's car was abandoned and the Orchard Apartments where the defendant lived. Detective Childs, an investigator with the crime scene unit, swabbed two areas of possible blood on the sliding glass back

door. According to Detective Childs, the house was less than a mile from the Orchard Apartments. Ms. Vrana from the crime lab testified that she obtained a partial DNA profile from one of the samples from the sliding glass door which was consistent with Ms. Beadle. She estimated that the probability of finding the same DNA profile from a randomly selected individual was one in 713 million.

Mr. Wilson testified at trial that, on a night during the Mother's Day weekend, he had gone to a nightclub in Shreveport.[5] After the club closed at 4 a.m., he went home, arriving between 4:15 and 4:30 a.m. He said he was drunk and lying on his couch when Brandon entered his house through the sliding glass door. Mr. Wilson testified that the defendant told him he had robbed somebody. He told the defendant to leave. Later, Mr. Wilson and his mother noticed a substance on the sliding glass door that looked like blood. Mr. Wilson then told his mother about the defendant's visit, and she took him to the police station. He subsequently gave a recorded statement to the police.

Evidence was presented pertaining to the defendant's and Ms. Cox's cell phone usage. Randall Thomas, who worked in the cybercrimes unit of the Bossier City Marshal's Office, testified for the state that the defendant's cell phone was "pretty active" on Friday night to early Saturday morning. None of the calls or texts were to or from Ms. Cox. However, there was a period of an hour and 19 minutes, from 12:01 a.m. to 1:20 a.m., when there

---

[5] Before Mr. Wilson testified, his mother was placed on the stand to give evidence pertaining to his competency. She stated that her 35-year-old son had had issues since birth and was considered "mild to moderate mentally handicapped." He also had some visual impairment. She said he was unable to live by himself and that he would get confused sometimes. However, she admitted that he knew the difference between the truth and a lie. The trial court made a preliminary finding of competency and allowed Mr. Wilson to testify.

was no outgoing activity. A written report from defense expert Ryan Ferreira concerning an extraction from Ms. Cox's cell phone was admitted into evidence by the defense in lieu of his live testimony. Ms. Cox's cell phone records revealed she used her cell phone frequently, but all outgoing communication by her ended between 11:30 p.m. Friday night and 12:30 a.m. Saturday morning.

During its case, the defense presented the testimony of several of the victims' neighbors in an effort to show that the victims were alive after Friday night. Jennifer Pearson testified that on Saturday afternoon she saw Ms. Beadle arguing with a black man in the front yard and that Ms. Cox came out the front door to tell them to stop before the police were called. Ms. Pearson testified that she thought the man was Mr. Washington, but her boyfriend told her it was the defendant. Ms. Pearson also testified that on multiple occasions Ms. Beadle and Mr. Washington argued in the yard and that he drove by and screamed at Ms. Beadle. According to her testimony, Mr. Washington came to her house on Friday night into Saturday morning and said he was going to kill Ms. Beadle. However, she admitted telling a police officer that she did not see or hear anything unusual around the time of the murders. Detective Hardesty was recalled on rebuttal and testified that, when he talked to Ms. Pearson on Sunday, she did not mention that, on Friday night into early Saturday morning, she saw Mr. Washington and heard him say he was going to kill Ms. Beadle. Instead, she said that she had not heard or seen anything unusual.

Another neighbor, Gloria Brown, testified that on Saturday she observed four or five people in the front yard of the victims' residence. Only one car was in the driveway and other cars were parked on the street.

14

She also saw a girl on a bicycle who was talking to a guy in the road by the sidewalk. She admitted that she did not know the victims and what they looked like. Tammy Evans, whose home was catty-cornered from the victims' house, testified that on Saturday evening she saw five or six cars parked along the road. She also asserted that she saw people going in and out of the victims' house but could not say how many.

The neighborhood postman, Jeffery Moosman, testified that, when he was delivering mail on Saturday morning, he noticed that their dog was not in the victims' yard barking at him as it usually was on the weekend. He also said that on Saturday there was only an unfamiliar rusty brown car at the house. He testified that he reported this information to a police officer on Monday. On rebuttal, that officer, Tiffany Brinkman, testified that he told her about the dog not barking on Saturday. However, he also told her that there was normally a silver car in the driveway which he did not see Saturday. As to the two vehicles that were in the driveway Monday, he told her that Saturday was the first time he had seen them there.

On rebuttal, the state presented the testimony of Josh Woodard, the general manager of the restaurant where Ms. Cox worked. He said that during the three years she worked for him, she was a "dream employee" who was never late and never missed work. On the rare occasion she was late, she called to let them know. He testified that she worked Friday night and was scheduled to work on Saturday morning at 10:30 a.m. However, she did not show up for work or call on Saturday. Additionally, he received no response to the phone call or text messages he sent her that day.

15

The trial court gave both oral and written reasons for its verdicts of guilty of first degree murder. Consequently, we have the benefit of the trial court's analysis and credibility determinations.

As to the defense's argument that the evidence did not support a guilty verdict because the exact time of death could not be determined, the trial court found otherwise. While the heat in the house precluded the pathologists who performed the autopsies from using normal forensic methods to determine the time of death, the trial court concluded that there was sufficient other evidence to make the determination that the deaths occurred late Friday night or early Saturday morning. This included Ms. Hanson's inability to contact her daughter by call or text all day Saturday and Ms. Beadle's corresponding failure to contact her mother as she usually did when her mother was babysitting her young son. The trial court also cited the testimony of Mr. Woodard that Ms. Cox was a highly dependable employee and that she failed to report for work at 10:30 Saturday morning or call or respond to his attempts to communicate with her. The trial court further looked to the data recovered from Ms. Cox's cell phone which showed her to be an active cell phone user; all outgoing communication by Ms. Cox ended abruptly between 11:30 p.m. Friday night and 12:30 a.m. Saturday morning. As to the defense testimony put forth by Ms. Pearson that she saw the victims on Saturday afternoon, the trial court noted that this was inconsistent with her statement to Detective Hardesty on Sunday that she had seen nothing unusual, and, furthermore, she also failed to tell the detective anything about Mr. Washington allegedly being at her home and threatening Ms. Beadle in the early hours of Saturday morning.

16

The trial court concisely enumerated the direct and circumstantial evidence tying the defendant to the murders.  It included:  the defendant's statement placing him at the crime scene on Friday night into early Saturday; his fingerprint in a substance containing Ms. Beadle's DNA which may or may not have been blood; his fingerprint in Ms. Cox's car, which was found abandoned near his apartment, along with Ms. Beadle's blood on the driver's seat; Ms. Beadle's DNA at Mr. Wilson's house where the defendant appeared early Saturday morning; Ms. Beadle's blood on the underwear worn by the defendant on Friday night; Sekeona Campbell's testimony that placed him in Ms. Cox's car at about 4 a.m. Saturday; and Mr. Stewart's testimony that the defendant asked him to give him a false alibi.

As to witness credibility, the trial court found all evidence presented by law enforcement personnel and all expert witnesses to be credible.  The trial court specifically found Sekeona Campbell and Mr. Woodard to be "extremely credible."  Also deemed credible were the defendant's friends, Mr. Stewart and Mr. Clark.  While the court stated that Mr. Wilson appeared credible, his testimony was "significantly discounted due to his intoxication."  However, the court stated it believed that Mr. Wilson saw the defendant at his house sometime on Saturday morning and that this specific part of his testimony was corroborated by the discovery of Ms. Beadle's DNA at his home.  All other lay witnesses presented by the state were deemed credible; however, the court found their testimony provided little information pertinent to the determination of the defendant's guilt or innocence.

As to the lay witnesses presented by the defense, the trial court found Ms. Pearson "less than credible" and discounted her testimony in its entirety,

noting that it differed completely from her statement to the police in 2014. In its oral reasons, the trial court additionally stated that her testimony appeared to be "fabricated" and that it made "absolutely no sense" that she would not have told the police about Mr. Washington's presence at her house and his alleged threats against Ms. Beadle when the victims were found dead about 24 to 36 hours later.

Although not mentioned in the written reasons, the trial court discussed Mr. Moosman's testimony in its oral reasons. It observed that, while his testimony about the cars at the house was confusing, the unusual absence of the dog from the yard on Saturday was corroborated by Ms. Hansen's testimony about finding the dog inside the house in its kennel on Sunday.[6]

The court expressed concern with the testimony of Ms. Evans, whom it described as "agitated and defensive while being questioned." However, it noted that some of her testimony was corroborated by that of Ms. Brown, who was found to be a credible witness. Nonetheless, the court found neither woman presented any evidence connecting the people they saw in front of the victims' house with the house or the murders, although Ms. Evans believed she saw someone going in and out of the house. Most importantly, the court observed that neither of these witness or Mr. Moosman testified that they saw the victims on Saturday or any day thereafter.

---

[6] Although not specifically mentioned by the trial court, the dog's absence from the yard on Saturday was additional support for the trial court's conclusion that the murders occurred Friday night or early Saturday.

In concluding its oral review of the evidence, the trial court stated that it believed there was both direct and circumstantial evidence of the defendant's guilt. However, it held that, even if there was solely circumstantial evidence, the totality of that circumstantial evidence excluded every reasonable hypothesis of innocence. The trial court stated that Ms. Beadle, through her DNA, followed the defendant around in his movements from her house throughout the locations he appeared early Saturday morning.

The final question resolved by the trial court was whether the defendant had the specific intent to kill or inflict great bodily harm upon more than one person as required by La. R.S. 14:30(A)(3). Given the grievous wounds inflicted upon the victims and the fact that each sustained a fatal gunshot wound to the forehead from the same gun, the trial court concluded that the defendant had the specific intent to kill both women. Based upon its conclusion that both the direct and circumstantial evidence overwhelmingly indicated that the defendant murdered the victims, while all evidence offered to prove otherwise was either not credible or inconsistent, the trial court found the defendant guilty of two counts of first degree murder.

### *Discussion*

Based upon our extensive review of the appellate record, we affirm the trial court's guilty verdicts in the instant case. We agree with the trial court's excellent and meticulously detailed written reasons, as well as its equally thorough and compelling oral reasons, wherein the court concisely set forth the basis for its decision after this lengthy and exhaustively litigated bench trial. The trial court, which had the benefit of observing the witnesses

19

and their demeanors, made multiple credibility determinations which informed its resolution of conflicting testimony.

In addition to the persuasive forensic evidence linking the defendant to the crime scene and Ms. Cox's car, his own statements to the police incriminated him in the murders. The defendant initially told the police that he had not been at the Bragg Street house or in Ms. Cox's car since Tuesday, May 6. He further stated that he had gotten a ride from Mr. Stewart on Friday night to go see Sekeona Campbell, arriving at about 11 p.m. After he was confronted with the fact that his fingerprint had been found in the house in a red substance that appeared to be blood, he changed his story and admitted being in the house on Friday, May 9. He then proceeded to narrate a fanciful account in which a raging Mr. Washington appeared outside Ms. Beadle's bedroom window and then climbed through the window, making threats against her. The defendant claimed that he fled the house so Mr. Washington would not know that he was the man in Ms. Beadle's bedroom, leaving her and Ms. Cox, a person he described as his best friend, alone with an enraged Mr. Washington.[7] Yet, even after the victims' bodies were found, the defendant did not confide Mr. Washington's alleged presence to anyone, including his close friends, Mr. Stewart and Mr. Clark. Furthermore, in his revised account, he again asserted that he had gotten a ride to go see Sekeona Campbell from Mr. Stewart, but altered his arrival time to 1:30 a.m. or 2:00 a.m. This was refuted by both Mr. Stewart and

---

[7] In his recorded statement to Detective Humphrey, the defendant stated that Mr. Washington said to him, "Oh, B, you with this bitch." Moments later, he told the detective that he was trying to leave before Mr. Washington recognized him. When Detective Humphrey reminded him that he had just said that Mr. Washington called him "B" and knew he was there, the defendant emphatically denied making the earlier statement.

Sekeona Campbell. Mr. Stewart testified that he did not see the defendant that night, much less give him a ride. And, in one of the most devastating indicators of the defendant's guilt, Sekeona Campbell testified that, when he arrived around 4 a.m., he was driving what was obviously Ms. Cox's car, a vehicle later found abandoned near the defendant's apartment.

The defendant contends that the evidence did not exclude every reasonable hypothesis of innocence.[8] We disagree. A reasonable alternative hypothesis is not one "which could explain the events in an exculpatory fashion," but one that "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.' " *State v. Captville*, 448 So. 2d 676 (La. 1984); *State v. Wooten*, 51,738 (La. App. 2 Cir. 2/13/18), 244 So. 3d 1216. The strong evidence, both direct and circumstantial, presented by the state of the defendant's guilt, viewed in the light most favorable to the prosecution, was sufficient to prove the defendant's guilt beyond a reasonable doubt.

This assignment of error lacks merit.

---

[8] In support of this argument, the defendant cited several factors, many of which he claimed could point to Mr. Washington as the killer. They included the failure to take fingernail scrapings from the victims for DNA testing; the lack of scratches and cuts on the defendant when he was interviewed by the police; failure to process Ms. Beadle's car, which was parked outside the crime scene, for fingerprints or DNA; the presence of matted grass under Ms. Beadle's window; the discovery of a palm print on Ms. Beadle's door frame which matched that of Mr. Washington, who had recently lived there; the loss at the laboratory of a hair recovered from Ms. Beadle's hand, when all the other hairs from which DNA profiles could be obtained were consistent with Ms. Beadle's own hair; and the presence of unknown DNA on Ms. Beadle's pants leg.

# MOTIONS FOR CONTINUANCE

The defendant contends that the trial court erred in denying his motions to continue the trial date on the basis of late disclosure of evidence.

## *Law*

Upon a written motion at any time and after a contradictory hearing, the trial court may grant a continuance, but only upon a showing that such a motion is in the interest of justice. La. C. Cr. P. art. 707; *State v. Roth*, 52,359 (La. App. 2 Cir. 11/14/18), 260 So. 3d 1230, *writ denied*, 18-2059 (La. 6/17/19), 273 So. 3d 1210. Additionally, a trial court has discretion to grant a timely filed motion for a continuance "in any case if there is good ground therefor." La. C. Cr. P. art. 712.

La. C. Cr. P. art. 709(A) provides that a motion for a continuance based upon the absence of a witness shall state all of the following:

> (1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial.
>
> (2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred.
>
> (3) Facts showing due diligence used in an effort to procure attendance of the witness.

Because the decision to grant or deny a motion for continuance rests within the sound discretion of the trial court, a reviewing court will not disturb the trial court's determination absent a clear abuse of discretion. *State v. Brown*, 52,501 (La. App. 2 Cir. 1/16/19), 264 So. 3d 697, *writ denied*, 19-0297 (La. 6/3/19), 272 So. 3d 892; *State v. Free*, 48,260 (La. App. 2 Cir. 11/20/13), 127 So. 3d 956, *writ denied*, 13-2978 (La. 5/30/14), 140 So. 3d 1174. Generally, a reviewing court will not reverse a conviction

even on a showing of an improper denial of a motion for a continuance, absent a showing of specific prejudice. *State v. Manning*, 03-1982 (La. 10/19/04), 885 So. 2d 1044, *cert. denied*, 544 U.S. 967, 125 S. Ct. 1745, 161 L. Ed. 2d 612 (2005); *State v. Saulsberry*, 52,031 (La. App. 2 Cir. 5/23/18), 247 So. 3d 1137, *writ denied*, 18-1067 (La. 11/5/18), 255 So. 3d 1053; *State v. Free*, *supra*.

The reasonableness of discretion issue turns primarily upon the circumstances of the particular case. *State v. Simpson*, 403 So. 2d 1214 (La. 1981); *State v. Cannon*, 26,906 (La. App. 2 Cir. 6/21/95), 658 So. 2d 728.

### Trial Court Ruling

On March 4, 2019, the trial court conducted a hearing on a defense motion to continue the trial, which was scheduled to commence on March 11, 2019. The motion concerned information gleaned from a forensic examination of Ms. Cox's iPhone, particularly the identity of the individual with whom she last communicated.[9] The trial court denied the motion to continue but granted the defense's request for a NCIC report on that individual. On March 6, 2019, the state filed a supplemental discovery response. Among other things, it provided the defense with information on the individual which included his AFIS prints, NCIC report, and local police reports.

---

[9] In denying the motion, the trial court stated that it was under the impression that the cell phone issue had been handled in December 2018. Our review of the record revealed that, in November 2018, the defense filed a motion for expert testing of the three cell phones (belonging to the victims and the defendant) collected by the police during their investigation. The minutes showed that on November 7, 2018, the trial court directed the defense to file an order granting the request with information about the expert by November 16, 2018; if the parties could not agree, the matter would be heard at a contradictory hearing on December 19, 2018. The minutes for that date show that the matter "has resolved." On January 7, 2019, the trial court signed an order directing that the cell phones be examined by the Bossier City Marshal's Office and then shipped to the defendant's expert. On January 11, 2019, a status conference was passed off the docket because there were no outstanding issues for the court to rule on.

On the first day of trial, the defendant filed a renewed motion to continue the trial. The allegations in the prior motion to continue were incorporated by reference. The defendant further asserted that on March 6, 2019, the state had disclosed what the defendant characterized as an agreement for leniency for Terrell Stewart. Additionally, he alleged that Mr. Stewart had told the state that two individuals had told him that Shawn Washington had admitted killing the victims. The defense sought additional time to find, interview, and subpoena those persons. The defendant also alleged that on March 7, 2019, the state had disclosed that, in an interview in February 2019, Mr. Washington's girlfriend had told the police that he might have told her about the murders on her way to work on May 11, 2014, at about 6:30 a.m., before the bodies were found. The defense requested additional time to find, interview and subpoena her.

Once again, the trial court denied the motion to continue. As to the person who last communicated with Ms. Cox, the trial court noted his name had been known in the case for years and that Ms. Cox's phone had been in law enforcement custody for years and, consequently, the defendant could have sought the information pertaining to it at an earlier date. The trial court pointed out that Mr. Stewart was a prosecution witness and had also been known in the case for years. The trial court stated it was unaware of any agreement of leniency but assumed that it merely concerned bench warrants being recalled because he showed up in court. As to Mr. Washington's girlfriend, Nancy Campbell, the trial court emphasized that she was a witness subpoenaed by the state who had likewise been known in the case for years.

*Discussion*

The decision to deny the motions for continuance rested within the sound discretion of the trial court. Based upon our review of the facts of this particular case, we find no abuse of the trial court's discretion. Furthermore, we find that the defendant has failed to show how the denial of his motions to continue prejudiced him.

Both Mr. Stewart and Nancy Campbell were trial witnesses who testified and were subject to cross-examination, as was Mr. Washington. As noted by the trial court, they had been identified as potential witnesses in the case for years. The same was true of the last person to communicate with Ms. Cox. Moreover, the facts above in the sufficiency discussion show that there was sufficient evidence to convict the defendant.

This assignment of error lacks merit.

## CONCLUSION

The defendant's convictions and sentences are affirmed.

**AFFIRMED.**